IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RCC FABRICATORS, INC., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UMOJA ERECTORS, LLC, et al., | : | No. 17-5304 |
| Defendants. | : | |

**MEMORANDUM OPINION**

**UNITED STATES MAGISTRATE JUDGE**             August 6, 2021
**TIMOTHY R. RICE**

       The City of Philadelphia in 2015 began to renovate a massive property at 4601 Market Street as its new public safety headquarters. Six years and more than $14 million later, the City has sold the property and abandoned the project, leaving a trail of construction litigation in its wake.

       This case features a narrow dispute between the project's contractor, D.A. Nolt, Inc. ("Nolt") and two sub-contractors, Umoja Erectors, LLC ("Umoja") and RCC Fabricators, Inc. ("RCC") for $198,000 in steel – a fraction of the project's massive price tag. During a trial on April 27-29, 2021, several facts were uncontested: (1) all steel supplied by RCC was installed no later than April 2017; (2) Nolt has received nearly $450,000 – about 85% of full payment – from the City for steel work performed by its sub-contractors; (3) Umoji has received about $250,000 – nearly 50% – for its role in the steel work; and (4) RCC has not received a penny for fabricating the steel.

       Complicating matters further, in a separate, unrelated lawsuit, Nolt is seeking an additional $2.7 million from the City, and the City is seeking $1.3 million for delays by Nolt even though the City abandoned the project for unrelated reasons shortly after Nolt completed its

work. See D.A. Nolt v. Philadelphia Municipal Authority, No. 18-4997 (the "City Lawsuit"). This has prompted Nolt to assert potentially inconsistent positions in the two lawsuits. In the City Lawsuit, Nolt claims its work was timely completed, notwithstanding the delays and errors by RCC and Umoja. Ex. 165 ¶ 99. In this lawsuit, Nolt claims the delays and errors by RCC and Umoja justify its withholding payment to RCC for more than four years even though it has received more than 85% of the money the City agreed to pay for steel work. Umoja admits that it withheld more than $66,000 from RCC even after Nolt directed Umoja to pay a portion of RCC's bill in 2017.

Nolt has not joined Umoja or RCC in the City Lawsuit, and has not separately pursued a claim for any backcharges against either of them. Instead, Umoja alleges a contractual right to withhold payment from RCC based on the possibility that claims could be brought against it by Nolt, and Nolt alleges a contractual right to withhold payment from Umoja and RCC based on the possibility that it faces exposure for damages to the City.

I find by a preponderance of the evidence that RCC complied with its contractual obligation to provide steel. Based on its contract terms and the Prompt Pay Act, RCC is entitled to damages of 85.5% of its $198,645.85 contract price, plus statutory interest. There is no dispute that RCC last delivered steel to the project in February 2017 and that the steel RCC provided was installed. Neither Umoja nor Nolt has established any lawful basis to withhold all payment for the steel used in the project.[1]

---

[1] Judge Pratter will decide to what extent, if any, the parties may have breached their contractual obligations by delaying the project. I need not reach that issue here because, as explained below: (1) the Prompt Pay Act required Nolt to pay its sub-contractors for materials that were provided and used in the project; and (2) the operative contracts did not permit Umoja or Nolt to withhold payment entirely based on the possibility that they might be liable for damages in the future.

**Findings of Fact**

    I.   The Project and the Parties

1. In 2015, the Philadelphia Municipal Authority ("PMA") entered into an agreement with Nolt (the "Nolt" agreement or contract) which required Nolt to provide general contracting services for Phase II of the construction of a planned Public Safety Service Campus at 4601 Market St. in Philadelphia (the "PSSC"). Ex. 1.

2. Nolt purchased a Payment Bond for the PSSC project from the North American Surety and Insurance Company ("NASIC").[2] Ex. 1.

3. On May 5, 2016, Nolt issued a purchase order to RCC for "complete shop drawings" of the steel for the PSSC project for $19,000. Ex. 69.

4. Nolt subcontracted with Umoja, requiring Umoja to undertake the "steel fabrication and erection work" for the PSSC project, including "layout and verification of field dimensions prior to fabrication," for $244,537. Ex. 3 at 18 (the "Umoja subcontract").

5. The Umoja subcontract specified that Umoja "shall coordinate the fabrication with and procure all steel from" RCC. Id.

6. On September 20, 2016, Umoja and RCC entered into a subcontract requiring RCC to "furnish (but not erect) all fabricated steel and related materials" for the PSSC project for $209,805. Ex. 4 at 1 (the "RCC subcontract").

    II.   Measurement and Fabrication Issues and Completion of the Project

7. The steel-related design portion of the PSSC project consisted of several steps. First, the

---

[2] Payment bonds are standard requirements for municipal construction projects. See Nicholson Const. Co. v. Standard Fire Ins. Co., 760 F.2d 74, 75 (3d Cir. 1985). They guarantee payment for businesses who provide materials and labor even if the prime contractor is unable to pay them. Id.

City's designer drew up "contract drawings" or "design drawings." N.T. 4/27/21 at 12. Second, those design drawings were translated into "shop drawings." Id.

8. Once the "shop drawings" were approved by the city's engineer -- but before they could be used to fabricate steel -- they had to be "field verified," i.e., the measurements and calculations used from the City's design drawings had to be checked against the physical space. Id. at 18.

9. Then, "field verified" drawings had to be finalized, i.e,. reviewed for the final time by Nolt and the engineer, who would confirm that they could be used to fabricate the steel for the project. Id. at 86.

10. Confirmed shop drawings were turned into erection drawings, or "e" drawings, which explained to Umoja's erection contractors at the site how to install the various pieces of steel. Id. at 203-204.

11. RCC was obligated to produce shop drawings that conformed to the project specifications included in "Bulletin 7," a design change document the City gave Nolt in March 2016 and which Nolt reminded RCC about on May 18, 2016. Ex. 70.

12. Nolt was required to provide RCC a "[s]urvey of existing field conditions including, but not limited to, installed anchor bolts, steel framing, elevations, etc." before RCC prepared the shop drawings. RCC subcontract "Qualifications & Exclusions."

13. RCC subcontracted its obligation to prepare shop drawings to a third party, some of whose employees worked in India. N.T. 4/27/21 at 72, 80.

14. Many of RCC's original calculations were inaccurate because they ignored changes to the project required by Bulletin 7. Ex. 138 at 4.

15.     RCC submitted shop drawings that included the changes in Bulletin 7 on June 28, 2016. Ex. 148 at 5.

16.     On July 15 and 18, 2016, the shop drawings were returned by the engineer to RCC for revision with comments. Id. at 2-3.

17.     Umoja was responsible for "verification of field dimensions prior to fabrication." Ex. A to Umoja subcontract, § 1(c).

18.     In August 2016, representatives of RCC and Umoja worked together to "field verify" some of the shop drawings. N.T. 4/27/21 at 21.

19.     Umoja was solely responsible for the field verification and RCC voluntarily assisted to help expedite the process. RCC bears no responsibility for any field verification errors. Ex. A to Umoja subcontract, § 1(c).

20.     Umoja reported it had completed field verification of all shop drawings on Friday, September 23, 2016. Ex. 14 at 1.

21.     After promising to begin delivery on Tuesday, September 27, 2016, RCC began delivering steel on Wednesday, September 28, 2016. Ex. 6 at 1; Ex. 89 at 3-4.

22.     RCC's steel required numerous modifications once it was delivered. Some pieces were too long, some were too short, and others were ill-suited for the specific connections they were designed to make because they had, e.g., been manufactured with the wrong kind of flange or with holes in the wrong spots.[3] Ex. 40.

---

[3]     Specifically, RCC had to modify Column 3C1 and Beam 8B1 and remake: (1) the WT pieces; (2) two 35B3 pieces; (3) the 11B1 end connection; (4) the Column 22C2 base plate; (5) the screen wall pieces; (6) 33B2; and (7) the 9B6-4C1 connection. Ex. 54. RCC also had to add stair extensions and calculate the shoring post location.

23. RCC replaced some pieces of steel and helped design on-site modifications. Ex. 40-42, 50.

24. Umoja was responsible for making any on-site changes to the steel and erecting the steel.[4] Id.; Ex. 3.

25. RCC has conceded that 3 pieces of its steel were "in need of repair," and that it repaired those pieces. Ex. 117.

26. RCC's witnesses testified more credibly than Umoja's witnesses, that the balance of the RCC fabricated steel comported with the shop drawings that had been approved by Nolt and the engineer. Any defects were due to faults in either the design drawings on which the shop drawings were based or the field verification of the measurements in the shop drawings, which was solely Umoja's responsibility. See Ex. 48.

27. The testimony of RCC's and Umoja's witnesses corroborated each other and were more credible than Nolt's witnesses about the fact that, in some cases, Umoja's field verification inaccuracies were caused by Nolt's failure to provide adequate access to "site conditions" during the field verification process.[5] Ex. 24; N.T. 4/27/21 at 184-85.

28. Final delivery of all steel was made on February 22, 2017, Ex. 5, and was used on the project, N.T. 4/27/21 at 117-20.

---

[4] The on-site changes Umoja made to the steel included: (1) making flange cuts for 17 pieces; (2) shortening six beams; (3) modifying two frames that were manufactured too small; and (4) modifying a 3-hole connection to a 2-hole connection. Ex. 40.

[5] For example, Umoja alleges Nolt refused to allow it to drill into what was thought to be an entirely concrete pillar that turned out to have a steel core, and refused to allow Umoja to "open" the roof to verify the measurements of the internal structure. Id.

29. The City issued a certificate of substantial completion for the project dated August 28, 2017. Ex. 64, ¶ 139.

### III. Payments and Escrow

30. Nolt's contract with the city allocated $507,443 for all the steel work. Ex. 30.

31. Nolt paid RCC $19,000 directly to prepare shop drawings. N.T. 4/27/21 at 13-14.

32. Umoja was paid a total of $250,381.2[6] for: (1) managing the steel fabrication and erection process; (2) the RCC steel fabrication; and (3) the steel erection. Exs. 3, 31.

33. Umoja submitted two "Applications for Payment" to Nolt to obtain payment for RCC's fabrication work and the work Umoja performed managing RCC's fabrication work.[7] Exs. 25, 29.

34. Umoja billed Nolt separately for its other steel-related work. See Ex. 30.

35. On December 28, 2016,[8] Umoja submitted its first Application for Payment ("AFP1") to Nolt, requesting $151,002 related to the RCC contract: $139,449.25 for work performed by RCC and $19,500 for Umoja's managing that work.[9] Id.

---

[6] NASIC asserts Umoja was paid $251,301.13, but the amounts in copies of checks submitted in evidence total only $250,381.20. NASIC FOF ¶ 99; Ex. 31.

[7] Although RCC provided information for a third Application for Payment, Umoja failed to submit a final payment request to Nolt on RCC's behalf. Ex. 10.

[8] Umoja originally submitted this Application for Payment on November 20, 2016, but revised it on December 28, 2016. Ex. 25 at 1.

[9] Umoja reached this amount by calculating that 65% of RCC's original contracted amount with RCC ($209,805) was $136,373.25, then deducting 65% of the $11,160 RCC had credited Nolt when it learned a coating it had included in its original bid was not required, then adding a proportional amount of sales tax ($10,330) and subtracting 5% for retainage ($7,947). Ex. 25.

36. On January 20, 2017, Umoja submitted its second Application for Payment ("AFP2") to Nolt in connection with RCC's contract, seeking $69,055; $60,504.67 for RCC's fabrication work and $8,550 for Umoja's managing that work. Id.

37. After submitting its second payment request, Umoja had requested 95% of all funds originally allocated for RCC's work and an additional amount RCC had included for sales tax, leaving only the 5% retainage with Nolt and/or the City. Id.

38. On February 9, 2017, in response to AFP1, Nolt paid the full $151,002 requested as follows: (1) Umoja was directly paid $9,262.50 for its management work; (2) a check for $66,238.50 was made out jointly to Umoja and RCC for RCC's fabrication work and provided to Umoja; and (3) $75,501 was deposited into an escrow account. Id.; N.T. 4/28/21 at 96.

39. That same day, Nolt separately deposited another $102,945.70 into the same escrow account based on Umoja's requests for payment unrelated to the RCC contract. Ex. 30; N.T. 4/28/21 at 96-97, 101.

40. Nolt made no payments related to AFP2. N.T. 4/28/21 at 104.

41. Umoja did not cash the $66,239.50 joint check Nolt provided, and refused to give RCC the money Nolt had provided for RCC's work. Id. at 25. Umoja retains possession of that check. Id. at 34.

42. The City paid Nolt $433,863.80 of the $507,443 allocated for steel work in the Nolt contract, and Nolt attempted to disburse more than it received for the steel work through payments to Umoja and an escrow account.[10] Ex. 30; N.T. 4/28/21 at 98.

---

[10] Excluding the joint check, whose funds Nolt retained when Umoja refused to provide the check to RCC or cash it, Nolt paid $428,827.91 of the $433,863.80 it was paid for steel work by the City, $5,035.91 less than it received.

43.     On May 31, 2017, RCC invoiced Umoja for the balance of its work, for a total of $11,161.62.  Ex. 10.

44.     RCC invoiced Umoja a total of $211,115.54 for its work within the original scope of the project.  Exs. 10, 25, 29.

45.     In a March 2017 letter to Nolt, RCC requested an additional $30,811.94 for additional fabrication work caused by the changes it was required to make to the fabricated steel.  Ex. 5.

46.     RCC has requested a total of $241,927.48 for its steel fabrication work on the PSSC project.  Exs. 5, 10, 25, 29.

47.     In total, Nolt was paid almost $11 million for its work on the PSSC project.  Ex. 32.  Approximately $600,500 of the agreed-upon contract price was retained by the City, and another approximately $440,000 was billed by Nolt to the City but never paid.  Id.

       IV.    The City Lawsuit

48.     In November 2018, Nolt sued the City, contending the City still owes it more than $1 million on its construction contract, including unpaid parts of its original contract, retainage from its original contract, and additional work necessitated by the City's actions.  See Complaint (doc. 1), D.A. Nolt v. Philadelphia Municipal Authority, No. 18-4997.

49.     The City counterclaimed against Nolt, asserting the project was not completed until 2018 and that Nolt is responsible for the City's delay-related consequential damages, which also total more than $1 million.  See id., Answer (doc. 4).

50.     Trial in the City Lawsuit was held in June and July 2021, and a decision is pending.  Id. (docs. 79-80, 84-91).

51.     Some of the damages Nolt claims in its suit against the City are comprised of potential charges for additional work by Umoja and RCC, i.e., consequential damages to Nolt caused by

delay in the steel work, as well as other costs to Nolt that would be "backcharges" if sought from Umoja and/or RCC. Ex. 126.

V. Conclusions of law

52. The Standard City Contract provisions were incorporated into Nolt's contract with the City. Ex. 1 at 42 ("This contract consists of the Standard Contract Requirements").

53. Nolt was required to purchase a "payment bond." Ex. 129 (Standard Contract Requirements) § 19.

54. Nolt's payment bond with NASIC is governed by the Public Work Contractors' Bond Law. Ex. 2.

55. In Pennsylvania, a "payment bond [is] solely for the protection of claimants supplying labor or materials to the prime contractor to whom the contract was awarded, or to any of his subcontractors, in the prosecution of the work provided for in such contract, and shall be conditioned for the prompt payment of all such material furnished or labor supplied or performed in the prosecution of the work." 8 P.S. §193.

56. To recover under a payment bond, a supplier must prove: (1) it sold the principal materials; (2) those materials were used in the project covered by the bond; and (3) it was not paid "all sums rightfully due" for all those materials. Kedar Corp. v. Am. Contractors Indem. Co., No. 11-6446, 2012 WL 440664, at *6 (E.D. Pa. Feb. 7, 2012).

57. NASIC is entitled to the defenses of its principal, Nolt. Superior Precast, Inc. v. Safeco Ins. Co. of America, 71 F. Supp. 2d 438, 452 (E.D. Pa. 1999).

58. NASIC's Payment Bond requires it to "pay for labor, material, and equipment" used in the PSSC project to any "entity having a direct contract with [Nolt] or with a subcontractor of

[Nolt] to furnish labor, materials, or equipment for use in the City Contract." NASIC Payment Bond, Ex. 1 §§ 1, 13(c).

59. The Contractor and Subcontractor Payment Act (CASPA) does not apply to public works contracts. 73 P.S. §501; Clipper Pipe & Serv., Inc. v. Ohio Cas. Ins. Co., 115 A.3d 1278, 1282 (Pa. 2015) ("CASPA does not apply in the context of public works projects").

60. Because the owner of the PSSC Project was the City of Philadelphia, all PSSC construction contracts were for public works projects. Id. at 1283–84 (defining public works projects as those "where the owner is a governmental entity").

61. CASPA does not apply to this case. Id. at 1282.

62. The "Prompt Pay Act" applies to public works contracts. E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist., 111 A.3d 220, 232 (Pa. Commw. Ct. 2015) ("the Prompt Pay Act, not CASPA, governs construction contracts between a government agency, such as a school district, and a contractor").

63. The Prompt Pay Act applies to this case. Id. at 232.

64. The Prompt Pay Act requires contractors and subcontractors who perform per their contracts to be paid, and allows the contracts themselves to govern performance and payment terms. 62 Pa. C.S. §§ 3931(b), 3932.

65. If a contractor withholds payment "arbitrar[ily]" or "vexatious[ly]," I have discretion to award 1% per month of interest as penalty. Id. § 3935(a).

66. "Except as otherwise agreed by the parties," pre-judgment interest is awarded for any successful Prompt Pay Act claim. Id. §3932(c).

67. When interpreting contracts under Pennsylvania law, "[t]he fundamental rule ... is to ascertain and give effect to the intent of the contracting parties." Murphy v. Duquesne Univ. of The Holy Ghost, 777 A.2d 418, 429 (Pa. 2001).

68. To do so, courts enforce the plain meanings of unambiguous contract terms, interpreting them as a matter of law. Id. at 430.

69. When contract terms are ambiguous, "the inquiry focuses on what the agreement manifestly expressed, not what the parties may have silently intended." Benec v. Armstrong Cement & Supply Corp., No. 139 WDA 2016, 2016 WL 6876320, at *3 (Pa. Super. Nov. 22, 2016).

70. Contracts should be read to give effect to all their provisions. Porter v. Chevron Appalachia, LLC, 204 A.3d 411, 419 (Pa. Super. 2019) ("in construing a contract, we must give effect to all its provisions and that an interpretation will not be given to one part of the contract which will annul another part of it").

71. To prove unjust enrichment, a plaintiff must show: (1) it benefited the defendant; (2) the defendant was aware of the benefit; and (3) allowing the defendant to keep the benefit without paying for it would be inequitable. Commonwealth v. TAP Pharm. Prods., 885 A.2d 1127, 1137 (Pa. Commw. Ct. 2005).

    VI.    Application to facts

72. RCC can recover payment from NASIC to the extent it is owed payment by Umoja and/or Nolt. Exs. 1, 129.

73. Under the unambiguous terms of the Umoja subcontract, Umoja is entitled to payment from Nolt to the extent that Nolt has been paid for its work. Umoja subcontract, § 4.1.2.

74.     Under the unambiguous terms of the Umoja subcontract, Nolt can withhold payment from Umoja if a lawsuit is threatened against it due to Umoja's actions only "until the condition requiring such measure has been remedied by [Umoja] to the satisfaction of [Nolt]." Umoja subcontract, § 4.4.

75.     Similarly, the Umoja subcontract permits Nolt to withhold payment for delay, but only "pending satisfactory correction, replacement and/or restoration of deficient work, material, or supplies, or of any work rejected if not conforming with this Subcontract or the Subcontract Documents." § 4.5.

76.     The Umoja subcontract also permits Nolt to deduct from its progress payments to Umoja "any sum due or to become due" to it by Umoja. Id. § 4.3.

77.     Nolt was not permitted to withhold payments of $75,501 it owed to Umoja and RCC in February 2017 under § 4.3 of the Umoja subcontract because "any sum due or to become due" references only an agreed-upon payment subject to an external triggering event like a date or schedule. It does not cover a contingent, disputed amount, such as potential backcharges or liquidated damages. See Charlson's Furniture Co., for Use of Pers. Disc. Co. v. Heigley, 53 A.2d 878, 880 (Pa. Super. 1947) (limiting judgment for time-bound payment to the amount "due" at the specific time). Sections 4.4 and 4.5 address backcharges and other kinds of damages but allow Nolt to withhold payment only until Umoja remedies any construction problem. Including those potential damages as "sums due" would render §§ 4.4 and 4.5 superfluous. Porter, 204 A.3d at 419.

78.     An interpretation of the contract that gives force to all its terms better reflects the intentions of the parties. Id. By referencing "sums due," § 4.3 addresses a situation in which Nolt had taken over compensating one of Umoja's subcontractors. For example, if Nolt had

written another check directly to RCC after Umoja refused to turn over the joint check, § 4.3 would have permitted Nolt to deduct the payment it made to RCC from its payments to Umoja. Section 4.3 did not authorize Nolt to retain the proceeds of that uncashed check or maintain all progress payments for steel in escrow once the construction had been completed to Nolt's satisfaction.

79. Once Umoja completed its work to Nolt's satisfaction, Nolt was no longer permitted to withhold progress payments under §§ 4.3, 4.4 and 4.5 of the Umoja subcontract.[11]

80. The Standard City Contract, the Umoja subcontract, and the RCC subcontract all differentiate between "progress" or "partial" payments and "final payment." Standard City Contract, Ex. 129 § 55; Umoja subcontract, Art 4. ("Payment") and Art. 5. ("Final Payment"); RCC subcontract at 3 ("Payment").

81. The City does not owe its final payment, including retainage of 5%, to Umoja until it has confirmed its satisfaction with Umoja's work and paid Nolt for it. Umoja subcontract, § 5.1.

82. Because the City never paid Nolt the full amount for Umoja's work, Nolt was never required to pay Umoja its final payment and retainage. Id.

---

[11] Umoja assumed the "the risk of non-payment by the Owner." Umoja subcontract § 4.1.2. RCC assumed the same risk in its contract with Umoja by specifically initialing the provision of the contract noting that its payments were "[c]ontingent upon payment by Nolt." RCC subcontract at 3 ("Payment"). Umoja and RCC both also assumed the risk that payment would be withheld until the work was accepted as satisfactory under §§ 4.4 and 4.5 of the Umoja subcontract. RCC subcontract at 1-2 ("Umoja shall have the same rights and remedies against [RCC] as Nolt has against Umoja under said Prime Subcontract with respect to [RCC's] work, with the same force and effect as though every such duty, obligation, right or remedy were set forth herein at length. Should any conflict exist between the terms of this Subcontract, the Prime Subcontract, or any of the other contract documents, with respect to [RCC's] work, the provision imposing the greater duty or obligation on [RCC] shall govern."). Nonetheless, neither Umoja nor RCC assumed the risk that Nolt would receive payment from the City but refuse to provide any payment well beyond the time any construction problems were remedied. Id.

83. Under the terms of the Umoja subcontract, Nolt is permitted to "recover" the "cost of altering any work" rejected by the City, i.e. the "backcharges" for extra work required by Umoja's actions. Id. § 11.1(c),

84. Under the terms of the Umoja subcontract, Nolt is also entitled to "reimburse[ment]" from Umoja for any "actual and/or liquidated damages" assessed against it caused by Umoja. Id. § 16.4.1.

85. Nolt was not permitted to withhold progress payments from Umoja past the date Umoja had completed its work, despite the City's threats of actual and liquidated damages, because the provisions permitting Nolt to recover backcharges and liquidated damages from Umoja specifically permit "recover[y]" and "reimburse[ment]," not withholding. Id. §§ 11.1(c), 14.1, 16.4.1.

86. To the extent that "damages or claims" extend beyond the end of a project, the Umoja subcontract allows Nolt to withhold only final payment. Id. § 22.4. ("If there are any damages or claims of any kind or nature that have not been settled or discharged when the Work is finished, final settlement between [Nolt] and [Umoja], final payment under the Subcontract, and acceptance of the Work, shall be deferred").

87. "Final Payment" is a defined term in the Umoja subcontract. Id. Art. 5.

88. The Standard City Contract requires Final Payment to consist of at least a 5% Retainage. Ex. 129 § 55. Required retainages diminish as work progresses, but are no greater than 10%. Id.

89. Nolt's contract with the City was incorporated into the Umoja subcontract. Umoja subcontract, Section A ("The Subcontractor covenants . . . in strict accordance with the Contract/Purchase Order between the Contractor and Owner dated August 20, 2015 and the

Assignment/Contract with the Philadelphia Municipal Authority (PMA), all of which are hereby made a part of this Subcontract by reference.").

90. Once construction on the project was completed to Nolt's satisfaction, it was required to pass on whatever progress payment it had received for Umoja's services to Umoja, but could retain final payment until the City was also satisfied. Id. §§ 4.1.2, 4.4, 4.5, 5.1, 5.3, 11.1(c), 16.4.1, 22.4.

91. Nolt breached its contractual obligations to Umoja by keeping funds in excess of the Retainage in escrow beyond the date construction was completed and by continuing to possess the funds reflected in the $66,000 joint check intended for RCC.

92. The terms of the Umoja subcontract were incorporated into the RCC subcontract even if the RCC subcontract was executed before the Umoja subcontract because, in Pennsylvania, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other." Neville v. Scott, 127 A.2d 755, 757 (Pa. Super. 1956). Where the RCC subcontract explicitly references, incorporates, and bases RCC's work on the Umoja subcontract, the parties clearly expressed their intention to be bound by that contract's terms. Ex. 4 at 1 ("Scope of Work/Price") ("which project documents and drawings are identified in Exhibit A and in the subcontract between D.A. Nolt, Inc. ('Nolt') and Umoja (hereinafter the 'Prime Subcontract')").

93. The RCC subcontract required Umoja to "make progress payments" to RCC "in an amount equal to that portion of the Subcontract amount properly allocable to [its] completed . . . work." RCC subcontract at 3 ("Payment").

94. Umoja's contractual obligation to pay RCC was contingent on its receiving payment from Nolt. Id. ("Contingent upon payment by Nolt").

95. The RCC subcontract does not permit Umoja to withhold all payment from RCC indefinitely. Umoja was permitted to withhold from RCC "an amount sufficient" to either (1) indemnify Umoja "in accordance with the terms of [the] Subcontract"; or (2) "satisfy, defend, and discharge any claim against" it caused by RCC; to the extent that those claims concerned RCC's subcontractors, Umoja was only permitted to withhold payment "provided that" Umoja had already paid RCC for that work. Id.

96. Because Umoja never paid RCC for anything, it was not permitted to withhold any potential backcharges caused by RCC's subcontractor's performance. Id.

97. The term "claim" is not defined in the Standard City Contract, the Nolt Agreement, the Umoja subcontract, or the RCC subcontract. Exs. 1, 3, 4, 129.

98. The term "claim" is ambiguous because it has different meanings in different contexts. Compare, e.g., Sayles v. Allstate Ins. Co., 219 A.3d 1110, 1120 (Pa. 2019) (interpreting the meaning of "claim" in the insurance context) with In re Grossman's, Inc., 607 F.3d 114, 127 (3d Cir. 2010) (interpreting the meaning of "claim" in the bankruptcy context).

99. In the RCC subcontract, the term "claim" means a formal legal claim that is actually being pursued because Umoja's right to withhold payment from RCC was limited to "an amount sufficient to satisfy, defend, and discharge any claim." Ex. 4 at 3 ("Payment"). To the extent the term "claim" could encompass a less formal request or threat of litigation, it would not be subject to formal "satisf[action]" or "discharge." Id.

100. Umoja was not permitted to withhold RCC's payment based on a "claim" against it because there never was any "claim"; Umoja has never been named in a lawsuit related to the PSSC project other than this one.

101. Umoja was not permitted to withhold funds from RCC based on the indemnity clause. RCC is obligated to "indemnify and hold harmless" Umoja, while Umoja is obligated to "defend, indemnify and hold harmless" RCC.  Ex. 4 at 4 ("Indemnification").  "[T]he duty to defend is a distinct obligation" from a "duty to indemnify," broader in scope and occurring earlier than a duty to indemnify, which arises only once liability has been established.  Sphere Drake, P.L.C. v. 101 Variety, Inc., 35 F. Supp. 2d 421, 427 (E.D. Pa. 1999).  To the extent that Umoja feared litigation over liquidated damages claimed by the City, it was not justified in withholding payment from RCC based on the indemnity clause because the indemnity obligations at that point flowed only from Umoja to RCC.

102. Umoja breached its contractual obligations to RCC by failing to turn over the $66,000 joint check Nolt provided on February 9, 2017.  Id. at 3.

103. Umoja also breached its contractual obligations to Nolt by "divert[ing]" the joint check, rather than treating it as "a trust fund for the benefit of" RCC.  Umoja subcontract § 14.2.

104. Under the RCC subcontract, RCC was obligated, "at its sole cost and expense, to repair or replace any defective or deficient fabricated steel."  RCC subcontract at 3 ("Warranty").

105. Under the RCC subcontract, RCC also was bound by the terms of the Umoja subcontract. Id. at 1 ("Contract Documents").

106. Under the RCC subcontract, RCC was not "entitled to any additional compensation for any alleged extra work" without a "written change order" authorizing the work and signed by RCC and Umoja.  Id. at 2 ("Changes").

107. Umoja was not obligated to pay RCC for the $30,000 in additional work it performed to fix the problems with the steel even if those problems were caused by Umoja and/or Nolt because there was no written change order authorizing payment for any additional work caused by field verification errors and RCC was contractually obligated to remedy any fabrication errors without additional payment. Id.

108. Umoja and Nolt are not obligated to pay RCC $30,000 for the additional work under the doctrine of unjust enrichment because they have not been enriched by the work; Umoja has been paid for only 50% of its work on the PSSC project and Nolt is currently pursuing damages from the City that include some of the funds RCC claims it is owed for additional work as consequential damages. See Ex. 121 (listing charges for RCC change orders as a potential "backcharge"); Ex. 126 (claiming those charges against the City).[12]

109. Umoja and Nolt are not obligated to pay RCC $11,160 that was included in its original bid for unnecessary galvanization work. Ex. 25.

110. Pursuant to its construction contract, RCC is owed $198,645.50 for its work on the PSSC project.[13]

111. RCC has proven by a preponderance of the evidence that: (1) it sold Umoja materials; (2) those materials were used in the PSSC project covered by the NASIC bond; and (3) it was not paid "all sums rightfully due" for those materials. Kedar Corp., 2012 WL 440664, at *6.

---

[12] To the extent Judge Pratter finds the City liable for these damages, Nolt must pay them to Umoja/RCC pursuant to the terms of their contracts. Similarly, if Judge Pratter finds the City owes Nolt its retainage, those portions based on Umoja and RCC's work should be paid to them.

[13] The original contract amount of $209,805.50 less the $11,160 credited for the galvanization work is $198,645.50.

112. Because Nolt received 85.5% of its steel charges from the City, it was required to pay 85.5% of the steel contract prices to Umoja.  Umoja subcontract, § 4.1.1; RCC subcontract at 3 ("Payment").

113. Because Umoja never paid RCC for its materials, NASIC is obligated to do so.  NASIC Payment Bond § 2.

114. Because NASIC is entitled to utilize Nolt's defenses, it is obligated to pay RCC 85.5% of the contracted amount of $198,645.50, or $169,841.90.  Id.

115. Pursuant to the Prompt Pay Act and the Public Work Contractors' Bond Law, NASIC is also liable to RCC for prejudgment interest (6% per annum) on $169,841.90, beginning on February 22, 2017, until the date of payment.  62 Pa. C.S. § 3932(c).

    An appropriate Order accompanies this Opinion.